LOTTINGER, Judge.
This matter is before us on an appeal taken by Harold E. Higgins, Jr., from a ■ruling of the Civil Service Commission upholding his dismissal from the Louisiana State Penitentiary.
The opinion of the Commission is as follows :
“The appellant, Harold E. Higgins, Jr., an Operating Engineer II employed with permanent status by the Department of Institutions at Louisiana State Penitentiary was removed from his position effective June 22, 1962, for reasons contained in a letter of the same date charging that on June 19, 1962, appellant permitted the escape of a prisoner by neglecting to check his assigned vehicle before leaving the industrial compound which enabled the prisoner to conceal himself in the tool box on the vehicle and ride through the gate at the industrial compound. The letter of removal further charges that after leaving the industrial compound, appellant went to Camp ‘H’ and there left the vehicle in the possession of another prisoner who drove the vehicle to a remote point on the prison farm where both prisoners effected their escape.
“An appeal to this Commission was filed within the legal delay in which appellant specifically denied the charges alleging that the action of the warden in dismissing him was arbitrary and discriminatory and not for cause.
“At the hearing of the appeal in Baton Rouge on August 15, 1962, both parties were represented by counsel.
“FINDING OF FACTS
“On June 19, 1962, at approximately 7 a. m. appellant, while in the industrial compound, instructed a trusty inmate to take the pickup truck assigned to appellant to the automotive repair shop *572 within the compound to have work done on the brakes. The trusty had a key to the large locked tool box on the truck, which was permissible under Penitentiary regulations. While on this errand, the trusty assisted in concealing a ‘big stripe’ prisoner (medium security inmate), assigned to work in the tag plant, in the tool box on the truck.
“Appellant, with two trusties and the concealed ‘big stripe’ inmate, drove out of the industrial compound through the Sally Port gate where the truck was checked by the security guards on duty at the gate. The tool box was not checked by either appellant or the security guards at the gate.
‘Appellant departed from the vehicle at Camp ‘H’ instructing the two trusties to proceed to Camp ‘C’ to perform certain duties. Instead of complying with appellant’s instructions, the trusties proceeded to a remote point on the farm where the trusty who had assisted the ‘big stripe’ inmate and the inmate effected their escape. The remaining trusty .returned the truck to appellant, stating that the other trusty had escaped.
“Appellant immediately drove to the control tower and reported the escape and it was then learned that the 'big stripe’ inmate had escaped also.
“Under the rule and regulations of the Penitentiary, trusties are permitted to drive vehicles and to perform work while not in the immediate custody of free personnel.
“The security guards are responsible for checking the vehicles through the gates of the industrial compound, but the free personnel assigned vehicles are responsible for the contents of the vehicle. Security guards were not responsible for checking the contents of the locked tool boxes on vehicles assigned to other employees.
“Appellant received orientation training in the rules and regulations of the Penitentiary and on the security procedure which requires that every employee assigned a vehicle is responsible for anything taken out of the industrial compound as well as the institution itself.
“CONCLUSIONS
“Appellant was negligent in not inspecting the tool box on the pickup truck before leaving the industrial compound. This negligence was the proximate cause for the escape of the ‘big stripe’ prisoner. However, under the existing rules and regulations of the Penitentiary, appellant was not responsible for the escape of the trusty.
“The cause as expressed in the letter of removal is sufficiently detrimental to the efficiency of the public service to justify the action of the appointing authority. There is nothing in the record to disclose that the action or removal was arbitrary, unreasonable or discriminatory.
“Accordingly, the appeal is dismissed.”
The appellant testified as follows:
“Q. Now, I am going to ask you if you ever received instructions to check your box on your truck?
“A. I have never received instructions to check my box.
"Q. Did you receive any instructions at all as to checking your equipment before you left one compound ?
“A. No, sir, I never received that instruction.
“Q. You had never received any instructions as to checking your equipment ?
“A. About checking my boxes in my truck. Now my equipment on my jobs, I checked them frequently.
*573 “Q. I’m talking about your truck as to whether you looked in the box, or whether you looked under the hood, or any place where a man could be concealed, had you ever received any instructions?
“A. No, sir. I have never received any instructions on that. My truck had been checked, sir, if I may continue, my truck had been checked by security on Sally Port and with the Hospital and at several places that I had been by security, but I have never been instructed myself to check my truck frequently in leaving from one area to another.
“Q. You were there when it was inspected by security?
“A. Yes, sir, as a rule, I’m right on the truck. Of course, I’m not there all the time because as I mentioned before a lot of times I am not working that day and another man has the duty. He’ll check my man out because my man is more familiar with boilers and pumps. They were the only ones assigned to my crew in the plumbing department.
“Q. How would security check them?
“A. Well, they would — at the Hospital they would check under the hoods. Now, at Sally Port they would check if I had my box unlocked or frequently they have asked me for my key to check the box. They have lifted up the hood, but most of the time — ”
Mr. Harry Dwyer, appellant’s immediate superior, who had been employed at the Penitentiary for twenty-two years, testified as follows:
“Q. Now, have you ever given Mr. Higgins, sitting here, instructions to check his boxes on this truck before going out of Sally Port to look for any prisoners that might be in it?
“A. No, that was done by the security head of it — security.
“Q. In other words the security division of the Penitentiary is responsible for checking those vehicles when they go out of Sally Port when they go out to the farm?
“A. They check mine, but—
“Q. They check yours?
“A.' — They also give a schooling before they go to work.
“Q. Right. In other words every employee whether he be a technical man or otherwise, it all has to do with control of the inmates. Is that right ?
* * * * * *
“Q. On going out of Sally Port or on going out the front gate, anywhere there is a security check, the security check is made by whom?
“A. Whoever is on the gate.
“Q. That man is generally with what department ?
“A. Security.
“Q. Security. Is it the duty of Mr. Higgins to check his box to see if there is a man in it before he goes out of Sally Port?
"A. As far as I know, it is security’s.”
Mr. John C. Butler, Chief Security Officer at the Penitentiary testified as follows:
“Q. Now, if there is a box on the truck, is the employee-driver of the truck responsible for its contents for security purposes or is it the duty of the guard at the Sally Port, or the security officer at the Sally Port, to check that box?
*574 “A. It is the duty of the Sally Port officer to check all vehicles leaving the compound and entering the compound. As long as an employee—
“Q. Isn’t it a fact, sir, that if either you or the Warden or any other administrative personnel come out of Sally Port, they are going to shake you down and check your vehicle? Is that right?
“A. Yes, sir.
*Q. They are going to ask you for the keys and they are going to look in the trunk of the car—
A. Yes, sir.
“Q. — to see if anybody is there?
“A. We automatically hand them the keys because it’s their responsibility—
“Q. The responsibility of the Sally Port custodian officer? Is that right, sir?
“A. Yes, sir.
“Q. Now, the vehicle in question— Mr. Higgins — that he had at that time, I just handed you the picture that was introduced in evidence, you are telling me now that it would be Mr. Higgins’ duty to unlock that box and check it, shake it down before he got to the Sally Port and it’s not the duty of the Sally Port officer to look in that box which is large enough to hide in?
“A. Yes, sir. That’s Mr. Higgin’s responsibility.
“Q. Now, can you — I know you are a fair man, I want to ask you, can you state under oath specifically that Mr. Higgins in his orientation was told specifically to check boxes on his truck going out of Sally Port?
“A. We didn’t tell them individually.
“Q. You usually do that, don’t you?
“A. No, sir, not in those words. No, sir, not to check boxes going out of Sally Port. They are told that they are responsible for anything entering or leaving the compound that’s—
“Q. General Security ?
“A. Yes, sir.
“Q. Well, then you’re not — you are being perfectly honest and fair in stating then that Mr. Higgins was not specifically instructed to unlock his box, look in it, look at it just before going out of Sally Port?
“A. No, sir, he was told that the locked boxes on his truck—
“Q. That’s all!
“A. We didn’t know he’d have one.
“Q. I beg your pardon.
“A. I said we didn’t know whether he’d have a box at that time or not.”
From the above and foregoing testimony, we feel that the regulations respecting an employee’s responsibility for the contents of his vehicle or for anything taken out of the compound, relate to physical items such as tools and implements and that the Commission was in error in interpreting these provisions in such a way as to place a duty on nonsecurity personnel to perform those duties which rested on security personnel. We are likewise of the opinion that the Commission committed error in holding that appellant-employee was negligent in not inspecting the tool box which negligence was the proximate cause of an escape thereby assimilating the matter to more or less a tort action. We are not concerned in these Civil Service cases with an employee’s negligence as such but whether his conduct, negligent or other *575 wise, impairs the efficiency of the service in which he is engaged. It is apparent from the above testimony that the obligation and duty to inspect for the possible escape of prisoners rested on the guard at the gates and furthermore that the appellant herein was never instructed to make such inspections and therefore in the absence of specific instructions, we are of the opinion that his failure to so inspect did not impair the efficiency of the service, nor warrant his dismissal, and it is accordingly ordered, adjudged and decreed that the ruling of the Civil Service Commission of the State of Louisiana is hereby reversed, annulled and set aside and it is ordered that appellant be reinstated in his Civil Service position with the Department of Institutions with full back pay from the date of termination of his employment until reinstatement.
Judgment reversed.